LISA SCOLARI
Attorney at Law
20 VESEY STREET, SUITE 400
NEW YORK, NEW YORK 10007
scolarilaw@gmail.com
(212) 227-8899

April 25, 2024

Hon. Gregory H. Woods
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007
via ECF

Re: United States v. Jesse Gibson,
22 Cr. 195 (GHW)

Your Honor:

Jesse Gibson is about to be sentenced for his third felony violation. At the age of thirty-seven he has been locked up for more than twelve years, most of his adult life. In light of what appears to be a career of crime one might expect Mr. Gibson to be a disillusioned, bitter man; one who has no hope of a decent future, resigned to the constraints of his criminal record. The reality could not be further from that expectation. He is one of the most positive,  forward-thinking individuals that we have met in our combined seventy years criminal defense work.

Mr. Gibson's positive attitude manifested when was released from state prison at the age of thirty-four. He was determined to qualify for legitimate work and shortly after his release, he paid eighteen hundred dollars borrowed from his brother,  to attend numerous courses at the W.D.C. Safety Training Academy in Manhattan. Those courses qualified him for advanced levels of construction work[1]. (Exhibit A) After being certified, Mr. Gibson found work with CarpetCycle where he started as a labor foreman and quickly became a valued employee.  The president of the company wrote a letter to the Court stating that Mr. Gibson was *reliable and punctual, with a positive attitude and excellent work rate*. (Exhibit B) He related that Mr.

---

[1]

| Course | Class Hours |
| --- | --- |
| Tool Box Talks | 2 hrs. |
| Confined Space Entry | 1 hr. |
| Electrocution Prevention | 1 hr. |
| Site Safety Manager Refresher | 8 hrs. |
| Supported Scaffold User and Refresher | 4 hrs. |
| Fire Protection and Prevention | 1 hr. |
| Flag Person | 1 hr. |
| Site Safety Plan | 2 hrs |
| Pre Task Meeting | 2 hrs. |
| Construction Safety and Health | 10 hrs. |
| Drug and Alcohol Awareness | 2 hrs. |
| Fall Prevention | 8 hrs. |

Gibson was a leader who insured the positive contribution of other workers. Despite being aware of Mr Gibson's current incarceration he went on to say that "*they would surely like to have him back at work*". *Id*. Mr. Gibson was working as many hours as the company could give him and was on track to gain union membership. There is no question that Mr. Gibson will be able to return to work for Carpetcycle when he is released.

Despite his incarceration, the disheartening consequence of his illegal conduct,  Mr. Gibson has continued to maintain a unique positive attitude. Instead of sitting in his cell bemoaning what he had done to himself, within days of his remand to MDC Mr. Gibson voluntarily began mopping, sweeping, and emptying trash cans. His volunteer work caught the attention of the counselors and officers in his unit. He was asked if he would be like to join a work crew and be paid $0.17/hour for his efforts. In a short time,  Mr. Gibson became a go-to inmate worker. When something needed to be done,  he was at the top of the list. He has worked a various positions in MDC including as a house orderly, cleaning the common unit areas; a unit team orderly, trusted to clean offices and other restricted areas; and as a food services worker. Mr. Gibson has consistently worked during his two years at MDC but has not sought or been given evaluations for all of the work he has done. He did however receive several highly complementary "work performance rating" evaluations which are attached. (Exhibit C)

BOP staff members are not permitted to write personal letters or any sort of inmate recommendation,  therefore it is difficult for them to express the true value of Mr. Gibson contributions. In an effort to document Mr. Gibson's exceptional work, a staff member wrote an extensive note in his food service evaluation. "*His work exceeds expectations. He always comes up with new ideas of doing things that make the job extremely efficient. Mr. Gibson maintains objectivity in situations of conflict. He works hard and earns trust by being dependable and consistent... [it]makes him stand out amongst his peers. My fellow cook supervisors ask for Mr. Gibson's help when they need an objective completed quickly and efficiently. We appreciate you coming in on your days off and spending excess hours to complete the mission. Thank you for all the hard work you do daily Mr. Gibson*"

In a unit orderly evaluation another staff member wrote not only of Mr. Gibson's work ethic but of his leadership qualities and contributions to other inmates  "*[He] goes above and beyond his assigned job description..drives himself exceptionally well... and is always willing to take on additional duties. Mr. Gibson works well with staff and other inmates. He mentors and encourages other inmates to get their GED, he also encourages inmates to get their lives together, when they are trouble [sic] inmates. Mr. Gibson is an inspiration for other inmates severing [sic] time in prison.*"

Mr. Gibson  has been called on to assist staff in making repairs in several areas beyond his orderly duties. He has requested and we have sent him several books on topics such as building maintenance, plumbing and electrical wiring. Not only has he devoured those books, he has shared his knowledge about construction with staff engaged in maintenance as well as other inmates. Mr. Gibson has performed the following tasks: snaking clogged toilets and sinks; installing new washers and dryers, including completing the necessary electrical wiring; painting

with oil based and latex paint;  stripping and waxing floors; other sanitation work;  barbering hair; and food preparation.

As a result of his dedication and responsible conduct Mr. Gibson has achieved an extraordinary level of trust among the staff at MDC. He is permitted to work around potential weapons, knives and other implements in the kitchen and to access areas with items that others would be tempted to steal. He is among the very few inmates who are allowed out of their cells to work during the frequent lock-downs that plague the MDC. Due to the trust placed in him during lock-downs Mr. Gibson is allowed out of his cell to work from 7:00 a.m. to 9:00 p.m. Apart from the time that he  must return to his cell for inmate counts, Mr. Gibson is cleaning, delivering meals to other inmates cells and replenishing supplies.

An incident that demonstrates Mr. Gibson's character occurred in the MDC kitchen one Thanksgiving morning, where he and eight other inmates were helping prepare dinner for the inmate population. They were supervised by a corrections officer (C.O.)  who was using a utility knife to unpack the turkeys for the holiday meal. When they finished using the it,  the C.O. put the knife in their pocket, but it fell out. The kitchen was noisy and the C.O. did not hear the utility knife hit the floor. Another inmate noticed, scooped it up, and secreted the knife on his person. At the end of the shift, the C.O. panicked when they realized the  knife was not in their pocket but missing. The C.O. correctly assumed it had been picked up by one of the inmates working in the kitchen and knew that they would be fired for losing control of what could become a dangerous weapon in the wrong hands. Reporting the loss would jeopardize C.O.'s job but they could not ignore a potentially serious situation.

Instead, the C.O. took Mr. Gibson aside and explained what had happened. They told Mr. Gibson because he was their most trusted and hardest worker. He was older than the other workers and the inmates respected him as a leader. After advising Mr. Gibson of the situation, the C.O. permitted him to speak to the other workers privately. When the C.O. stepped away, Mr. Gibson corralled the kitchen workers together and told them what would happen if the utility knife was not immediately returned to the C.O. He explained that in addition to the C.O. losing their  job, the inmates would lose their work positions and be thrown into the Special Housing Unit. He emphasized that the C.O. had treated them well and did not deserve to be punished for an accident. He said " I'm going to turn around, I don't want to know who has the knife, but I want it returned right now." The inmate who secreted the knife quickly dropped it on the floor, Mr. Gibson heard it, turned around and picked it up. When he returned it to the relieved C.O. Mr. Gibson helped avert a a potential disaster.

### *Procedural background*

Mr. Gibson pled guilty to the charges in the indictment without an agreement with the government. The plea comprised three counts: the illegal sale of firearms, and two counts of felon in possession of specific firearms. 18 USC §§922 (a)(1)(A) and 922(g).  The government submitted a *Pimental* letter containing the prosecution's view of Mr. Gibson's potential guidelines to probation, but much of it was correctly discounted in probation's independent guideline evaluation. The revised presentence report, which includes a recent guideline

amendment, indicates that Mr. Gibson's advisory guideline range is 57-71 months based on a total offense level of 23 and Criminal History Category of III. Without the knowledge of Mr. Gibson's exemplary work evaluations and jail conduct the probation officer recommended a sentence of fifty-seven months. The defense agrees with the guideline calculation and hopes to convince the Court that in light of the 18 USC §3553(a) factors, a sentence of forty-eight months would be sufficient but not greater than necessary in this case.

### *Nature and Circumstance of the offense*

Considering how well Mr. Gibson was doing prior to the acts that led to his arrest in this case, it is difficult to explain how he fell from grace. There is no question that his conduct was serious and he readily takes full responsibility for it. In part, Mr. Gibson's behavior is explained by his unanticipated discovery of guns in a storage unit that he took over after the original renter went to prison. Initially he did not know the guns were there and when he discovered them he had no desire to possess them. As a prior felon who had been to prison twice, Mr. Gibson was afraid to go to the police. Instead, he trusted someone that he knew from the neighborhood to help him. That person turned out to be an informant, who introduced Mr. Gibson to an undercover officer and another informant. Mr. Gibson then either assisted in or brokered a sale of the guns in question. It was incredibly foolish for him to do so and there is no excuse for it.

### *Jesse Gibson's History and Character*

Mr. Gibson grew up poor in Harlem, in public housing plagued with drug use, sales and violence. He recalls seeing people passed out from overdoses and drug detritus-- needles and crack bottles, strewn both inside and outside of his building. Jesse's extended family lived in his maternal grandmother's three-bedroom apartment, which was overcrowded with six adults and three children in residence. Most of the adults did not work and some spent their time drinking. Jesse's mother Barbara Shuler, who worked as a nurse, and his grandmother, Mabel Jeffery were the sole support of the extended family. Jesse was very close to his mother and was deeply affected when she died suddenly of an aneurism when he was eighteen. Prior to his mother's death, Jesse had steered clear of the criminal conduct that plagued his neighborhood. When she died, he "lost his way", dropped out of school, and not long afterwards, incurred his first arrest.

At the young age of eighteen, Jesse's initial stint in state prison was difficult. Prison was fraught with violence and, as many inmates did, he became a Blood for his protection. During his second stint in prison, Mr. Gibson incurred multiple infractions for his conduct. Despite this he completed a welding program, earned a certificate, and worked in various welding jobs while incarcerated. (PSR ¶ 88) After leaving state prison Mr. Gibson "left that [the gang] behind" and has not considered himself a gang member since.

After his arrest, Mr. Gibson reconnected with a former girlfriend who is living in New Jersey and working at a responsible position. DeJhani Brown has invited Mr. Gibson to join her when he is released. She has written of his good character. (Exhibit D) Mr. Gibson's older brother Kendall has also written a letter to the Court (Exhibit E) In addition to relocating from his neighborhood which is fraught with bad associations, in New Jersey Mr. Gibson will be living in the state where his employer is based. As indicated in the CarpetCycle letter, Mr.

Gibson has a job waiting for him. Mr. Gibson has also written a thoughtful letter to the Court showing his insight and remorse. (Exhibit F)

### *Objections to the presentence report*

Page 9, paragraph 41

Mr. Gibson did not maintain the storage unit for a Gorilla Stone gang member. It is not correct that he said that in his post arrest statement. While he did say that he was aware that the prior renter of the unit was a "Gorilla",  he never said he was keeping the unit for him. He also repeatedly said that he himself was no longer Gorilla; when he came home he was "done with them".

Page 11, paragraph 63

The report incorrectly lists two convictions for the 2014 arrest. According to Mr. Gibson's "rap sheet" he was charged with criminal sale of a controlled substance and criminal possession of a controlled substance. However he was only convicted of criminal possession of a controlled substance (NY Penal Law §220.16)  "in full satisfaction" of sale charges (Exhibit G)

### *Conclusion*

While the crimes that Mr. Gibson committed are serious, there is real reason to believe that he will continue on the path that he began prior to this arrest and continued on during his incarceration in MDC. Mr. Gibson's successful efforts at obtaining training and legitimate employment,  as well as his exemplary conduct in MDC demonstrate his determination and strength of character. Both indicate that he has the capacity to do well upon his release. Therefore,  we respectfully request that the Court vary downward and sentence Mr. Gibson to forty-eight months incarceration.

Respectfully,

*Lisa Scolari*

Lisa Scolari and Thomas Ambrosio