

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

May 2, 2024

**BY ECF**
The Honorable Gregory H. Woods
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Jesse Gibson*, 22 Cr 195 (GHW)

Dear Judge Woods:

      The Government respectfully submits this letter in advance of the sentencing of the defendant, Jesse Gibson, scheduled for May 9, 2024.  As set forth below, the defendant sold numerous loaded firearms to numerous individuals, including an undercover officer and confidential informants, over the period of a few months.  In addition to the firearms that the defendant sold, law enforcement found two more firearms in his storage locker at the time of his arrest.  Of the many firearms the defendant sold and possessed, one was stolen, another had a defaced serial number, and two were used in multiple shootings.[1]  Given the defendant's prior felonies, the defendant was not even allowed to possess these loaded guns, much less sell them to others.  Throughout the Government's investigation, the defendant demonstrated easy access to a ready supply of guns and a willingness to sell those guns to whomever expressed an interest.  The defendant made each of these unlawful sales knowing that what he was doing was illegal and with no regard for how and why his customers were seeking to purchase loaded firearms illegally.

      As the Court is aware, the unlawful distribution of loaded firearms, particularly ones that are defaced, presents a tremendous danger to the community, and helps perpetuate senseless violence in our communities.  Indeed, the fact that some of the guns in this case were used in shootings speaks precisely to the fact that guns bought and sold in this unlawful and illicit manner are done with an understanding that the purchaser is going to be illegally possessing firearms.  That is all the more true where a firearm is defaced, as firearms are defaced for the express purpose of preventing their being traced.  The defendant's willingness to traffic in firearms is particularly concerning given that he has a serious criminal history, including a prior conviction for firing a gun and another conviction for repeatedly selling drugs to an undercover officer.

---

[1] Although the Government does not believe that the defendant himself participated in the shootings, the fact that these firearms were used in shootings exemplifies how dangerous trafficking firearms is and how little regard the defendant had for where the guns came from and how they would be used in the future.

For reasons set forth below, the Government asks that the Court impose an above-Guidelines sentence of at least 96 months' imprisonment to reflect the seriousness of the offense, promote respect for the law, protect the public, and ensure adequate general and specific deterrence.

## A.      Offense Conduct

The defendant was released to parole in February 2021 in connection with his conviction for criminal possession of a controlled substance in the third degree. Almost immediately upon his release, the defendant was offered to take over a storage unit from a fellow Gorilla Stone member, Brandon Nieves, who had been arrested in connection with a major takedown of Gorilla Stone gang members. According to the defendant, the storage unit had 3 guns inside at the time he took over the lease. Accordingly, the defendant, who had two prior felony convictions, began illegally possessing firearms immediately after being released into parole. And within months of his release, he began selling loaded firearms to an undercover officer and confidential sources.

Beginning in November 2021, the defendant arranged to meet with an undercover officer (the "UC"), and the defendant sold a .22 caliber Ruger rifle, which had been stolen, and ammunition, including a magazine and numerous cartridges, for $1,300. PSR ¶¶ 11-14. In recognition of the dangerousness involved in the illegal sale of firearms, the defendant kept a firearm on him at the time, which he showed to the UC, and told the UC that he was not selling that gun. The defendant gave the UC his phone number so that they could arrange further gun sales, which they did.

Approximately two weeks later, the defendant sent the UC a photograph of another firearm, which the defendant offered to sell for $1,100. PSR ¶ 16. The defendant and the UC arranged a meeting location, and the defendant gave the UC a loaded 9mm Springfield Armory XDS pistol and a magazine with eight bullets. PSR ¶ 20. Once again, the defendant showed the UC that he had another firearm on him that he was not selling. The defendant further explained to the UC that the defendant was waiting on his gun supplier in Long Island to provide more guns, which would allow the defendant to drop prices in the future. PSR ¶ 19.

About a week later, the defendant arranged to meet with an individual, to whom the defendant sold a third firearm – a loaded, defaced 9mm firearm – and three vials of marijuana for $1,500. PSR ¶¶ 22-24.

About a month later, in January 2022, the UC and the defendant again exchanged text messages about selling firearms, and the defendant sent the UC photographs of a firearm over a social media application, Telegram, which is often used for its encryption and automatic deletion features. A confidential informant ("CI-1") then arranged to meet with the defendant to purchase the firearm that the UC and the defendant had discussed. The defendant sold CI-1 a loaded 9mm Glock with five cartridges for $1,200. PSR ¶¶ 30-31. Approximately one week later, the defendant and CI-1 arranged to meet up again so that the defendant could sell yet another firearm, a loaded .22 caliber Cobra Derringer, and two rounds of ammunition and marijuana, for $2,800. PSR ¶ 35.

Finally, about a month and a half later, CI-1 and the defendant again arranged to meet up so that the defendant could sell another loaded firearm.  This time, the defendant brought a co-conspirator (the "CC").  Once CI-1 met up with the defendant and the CC, the defendant directed the CC to give CI-1 the gun, and CI-1 gave $900.  Shortly after this controlled buy, law enforcement moved to arrest the defendant, who attempted to run, but was ultimately stopped by law enforcement.

Altogether, the defendant arranged to meet up with multiple people over the course of a few months to sell 6 loaded firearms, one of which was stolen, one of which was defaced, and one of which had been used in two shootings.  On the day of his arrest, law enforcement searched the storage unit that the defendant had been using in connection with several of the gun sales and found two more loaded firearms, one of which had been used in a shooting.

In connection with his recoded post-arrest statement, the defendant told law enforcement that he had been given the storage unit as soon as he was released from custody in connection with his last conviction, as a way to help him get on his feet.[2]  The defendant said that he took the storage unit over from a Gorilla Stone member, Brandon Nieves, who is a very senior Gorilla Stone member (a co-Godfather of one of the eight caves).  Nieves was arrested and has now plead guilty for charges that include participating in a racketeering conspiracy as a leader of the violent gang, Gorilla Stone.  *See United States v. Reid et al.*, 20 Cr 626 (PMH).

The defendant become a Gorilla Stone member while in custody in connection with a prior conviction.  Although the defendant claims that he is no longer a Gorilla Stone member, he has a Gorilla tattoo on his arm, he admitted to taking the storage unit over from a very senior Gorilla Stone member, and he has made public posts to his social media accounts (including while in custody) that demonstrate his ongoing affiliation with the Bloods and with Gorilla Stone gang in particular.

**Posted on December 7, 2022 (while in custody)**



This is a pose associated with the Gorilla Stone gang

---

[2] Defense counsel takes issue with the PSR's statement that the defendant was "maintaining" the storage unit for a Gorilla Stone member, but there is no dispute that the defendant knowingly took custody of the storage unit from a very senior Gorilla Stone member, immediately after the defendant's release, and claimed that there were 3 guns in the unit at the time.

**Posted a year ago (while in custody**) with the caption "who thought we will have the same bday the same jail same cell . . ."[3]



The person on the left is flashing a diamond, which is a sign for Gorilla Stone

**Posted a year ago (while in custody) –caption "free me free the real love my self always"**



**Posted on January 7, 2022**

---

[3] This post, along with several others, reflect that the defendant appears to have had access to a contraband phone while in custody.



"Red always on top," is a reference the Bloods color.

**Posted on January 7, 2022**



**Posted on April 14, 2021 with the caption:**

 thebossmerc Family always first 🦍



**Posted on April 4, 2021 with the caption,**

thebossmerc I'm on my ape shit bossin 🦍 🦍 🦍 🩸



The defendant also posted a photograph of a Gorilla with the caption, "Boss up or get boss around" and two Gorilla emojis, for Gorilla Stone. Several of the defendant's posts have also had comments that included emojis of a Gorilla, to represent Gorilla Stone, and at least one that mentioned "#Ape."

## B.    Discussion

### 1.    Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

### 2.    An Above-Guidelines Sentence Is Appropriate in This Case

The Government respectfully submits that an above-Guidelines Sentence of at least 96 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing. In particular, an above-Guidelines sentence is necessary given the seriousness of the criminal conduct, the need to promote respect for the law and protect the public, and the need to assure both general and specific deterrence.

**(1) The nature and circumstances of the offense and the history and characteristics of the defendant and**
**(2) The need for the sentence imposed—**
   **(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

As set forth above, the nature of the conduct was very serious, and the seriousness is underscored by the defendant's prior criminal history, which includes a prior conviction for firing a gun and a prior conviction for repeatedly selling crack cocaine to an undercover officer. In addition, the defendant committed this offense (as well as his prior offense), shortly after he was released on parole – a fact that the Guidelines do not account for and for which he will face no additional term of imprisonment arising from the parole violation. The conduct is even more concerning given the defendant's self-professed and advertised connections to the violent gang Gorilla Stone and the fact that some of these guns were used in shootings. The defendant, who was not himself legally allowed to possess guns given his prior felony convictions, not only began possessing loaded guns immediately after his release from custody, but within months began selling loaded guns to several different people. Indeed, within just a few months of his release, the defendant developed a ready supply of loaded firearms, using a gun supplier in Long Island.

The defendant also developed a connection with a co-conspirator, who the defendant brought to facilitate the last controlled buy.  Not only did the defendant sell loaded firearms, but he armed himself while he sold the guns and further sold a stolen firearm[4], as well as a defaced firearm, whose entire purpose is to avoid being traced and detected.  More to the point, one of the guns he sold was used in two shootings.  The defendant was also keeping two more guns in his storage unit, which law enforcement recovered at the time of his arrest, one of which had been used in yet another shooting.

The defendant had no regard for how the firearms he was selling were going to be used by others.  The defendant was willing to sell guns to numerous people, including people he did not know, and did so repeatedly throughout the course of just a few months.  And in recognition of the dangerousness of his own conduct, the defendant kept a gun on him at the time he was making these sales.  As the Court is well aware, illegal firearms trafficking is incredibly dangerous and is perpetuating the gun violence that destroys lives and ravages communities.  The laws and regulations around gun sales are intended to ensure that guns do not wind up in the hands of people who plan to use them unlawfully, including in connection with violent shootings.  But this is precisely the type of customer who is using an encrypted messaging platform like Telegram to arrange secret gun sales, and buying stolen and defaced guns in hidden bags and with stacks of cash – the exact type of transaction the defendant repeatedly engaged in in connection with this case.

The defendant's actions are all the more troubling given his self-proclaimed affiliation with the incredibly violent Gorilla Stone gang and the fact that he claims to have taken over the storage unit where he was keeping some of the guns from a senior member of Gorilla Stone.  While the defendant attempts to disclaim his ongoing affiliation with Gorilla Stone, his tattoo, social media posts, and fact that he took the storage unit over from a very senior Gorilla Stone member, demonstrate ongoing affiliation.

The defendant also didn't just sell guns, he was also selling marijuana to the same people that he was selling the guns to, which further increased the potential dangerousness of the defendant's conduct, given the well-established violence around drug dealing.

> **(3) The need for the sentence imposed—**
> **(B) to afford adequate deterrence to criminal conduct;**
> **(C) to protect the public from further crimes of the defendant; and**
> **(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

An above-Guidelines sentence is also appropriate to ensure general deterrence.  A serious sentence of imprisonment is necessary to send the appropriate message that individuals who not only possess guns unlawfully, but repeatedly sell them to others, will face a serious sentence of imprisonment, particularly defendants who have a serious criminal history and are on parole at the time they commit this offense.

---

[4] The Guidelines range does not account for the fact that one of the firearms was stolen, as the enhancement only applies to the one firearm that had a defaced serial number.

A Guidelines sentence is further necessary to ensure specific deterrence and protect the public from further crimes of the defendant. As mentioned throughout, the defendant has two prior serious felonies involving a gun and drugs, for which he spent approximately 12 years in prison.

With respect to his prior convictions, the defendant was previously sentenced to 3 years' imprisonment for firing a gun. After being released on parole in connection with that offense, the defendant thereafter had his parole revoked for an unknown reason. After being re-released on parole, the defendant began selling crack cocaine to an undercover officer on numerous occasions and was ultimately convicted and sentenced to 90 months' imprisonment. While in custody for this last offense, the defendant had an extensive disciplinary history, involving all manner of incredibly dangerous and egregious conduct, including possessing a weapon, possessing contraband, smuggling, fighting, harassment, and failing to abide by a direct order. As a result, the defendant was placed in "keeplock," which is one of the most serious forms of punishment for disciplinary violations, for days and months at a time.[5] And yet, despite having served these prior serious sentences of imprisonment, the defendant chose to repeatedly engage in the illegal conduct that underlies this offense.

An above-guidelines sentence is necessary to ensure adequate specific deterrence in this case given that the defendant has already demonstrated that a sentence of 90 months' imprisonment is little deterrent for his ongoing illegal conduct. Despite having spent significant time in prison, the defendant began illegally possessing guns immediately after his release and began selling those guns within months of his release. Accordingly, the defendant's prior sentences of imprisonment, or the fact that he has been on parole, did nothing to deter him from immediately engaging in further very serious illegal conduct involving guns and drugs. An above-Guidelines sentence is further appropriate to ensure specific deterrence in this case given that the defendant is not going to face any additional sentence of imprisonment for having committed this crime while on parole – both because the Guidelines do not account for this fact and because the defendant is not facing a state violation proceeding.

---

[5] The Government recognizes that the defendant's behavior while in custody in connection with the instant offense has improved, that behavior must be considered in the context of his recent very serious disciplinary history in connection with his prior offense. Moreover, the fact that the defendant has worked jobs and taken courses does not ameliorate the tremendous danger that his instant offense entailed, and his willingness to repeatedly engage in such serious unlawful conduct requires a serious sentence of imprisonment.

**C.      Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose an above-Guidelines sentence of at least 96 months' imprisonment.


Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney


by:    /s/ Courtney Heavey
       Courtney L. Heavey
       Assistant United States Attorney
       (212) 637-2413